# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Richard J. Contreras,

        Plaintiff,

v.

Michael J. Astrue, Commissioner of
Social Security,

        Defendant.

Civil No. 08-1196 (DWF/JJK)

## MEMORANDUM OPINION AND ORDER REVERSING REPORT AND RECOMMENDATION

---

Benjamin L. Weiss, Esq., Southern Minnesota Regional Legal Services, Inc., counsel for Plaintiff.

Lonnie F. Bryan, Assistant United States Attorney, United States Attorney's Office, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court upon Plaintiff Richard J. Contreras's objections to Magistrate Judge Jeffrey J. Keyes's Report and Recommendation dated March 25, 2009, recommending that: (1) Plaintiff's Motion for Summary Judgment be denied; (2) Defendant's Motion for Summary Judgment be granted; (3) the decision of the Commissioner of Social Security be affirmed; and (4) this action be dismissed with prejudice. The Court has conducted a *de novo* review of the record, including a review of the arguments and submissions of counsel, pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.2(b). Based on the record before it, the Court must respectfully disagree with the

decisions reached by the Administrative Law Judge ("ALJ") and the Magistrate Judge because substantial evidence on the record as a whole does not support denying Plaintiff's benefits. Consequently, for the reasons set forth below, the Court reverses the decision of the Commissioner of Social Security and grants Plaintiff's Motion for Summary Judgment.

At issue in this case is a determination as to whether Plaintiff meets the criteria for mental retardation found in Listing 12.05 of the Listing of Impairments, which would qualify him to receive Social Security Disability Insurance and Supplemental Security Income benefits. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Mental retardation is described as follows:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> A.    Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

> Or

> B.    A valid verbal, performance, or full scale IQ of 59 or less;

> Or

C.     A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.     A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

  1.     Marked restriction of activities of daily living; or

  2.     Marked difficulties in maintaining social functioning; or

  3.     Marked difficulties in maintaining concentration, persistence, or pace; or

  4.     Repeated episodes of decompensation, each of extended duration.

*Id*. The parties do not dispute that Plaintiff meets the two criteria in Listing 12.05C, in that he has been evaluated as having a verbal, performance, or full scale IQ score between 60 and 70 and suffers a severe second impairment.[1]  Rather, the Plaintiff challenges the Commissioner's finding that he does not suffer from deficits in adaptive functioning and that his condition did not manifest before he was 22 years old.  The Report and Recommendation ("R&R") in this matter recommended upholding the Commissioner's decision.

---

[1]     There is some discussion in the parties' briefing regarding instances in which Plaintiff has tested with IQ scores in the 70s, but a court presented with multiple scorings must use the lowest score.  *Muncy v. Apfel*, 247 F.3d 728, 733-734 (8th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D)).

# BACKGROUND

## A.    Procedural History

On April 22, 2005, Plaintiff filed for disability insurance benefits and supplemental security income, alleging a disability onset date of October 5, 2004.  (Doc. No. 8, Tr. 14.)  The applications were denied initially and on reconsideration.  (Tr. 28-29, 49-52, 54-60, 113-14.)  On July 3, 2007, after Plaintiff's timely request, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 11-27.)  Plaintiff sought review of the ALJ's decision by the Appeals Council, but the Appeals Council denied the request for review.  (Tr. 5-7.)  The ALJ's decision therefore became the final decision of the Commissioner of Social Security.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822-23 (8th Cir. 1992).  Plaintiff appealed to the United States District Court, District of Minnesota, on May 1, 2008.

## B.    Plaintiff's Background and History

Plaintiff, Richard J. Contreras, is a resident of Ramsey County in the State of Minnesota and lives at 781 Ashland Avenue, St. Paul, MN 55104.  (Compl. ¶ 1.)  Plaintiff alleges that he qualifies for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") because he meets the listing requirements of Listing 12.05C of the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (*Id.*)

Plaintiff was forty-five years old at the time of the hearing before the ALJ.  (Tr. 358.)  Plaintiff was employed at Sam's Club from April 1995 through September 1998

(Tr. 180.)  At Sam's Club, he worked four to eight hours a day, five days a week.  (Tr. 183.)  Between October 1997 and April 2001, he had six different jobs.  (Tr. 127.)  At each one of these jobs, Plaintiff continued to work a comparable schedule to the schedule he worked at Sam's Club.  (Tr. 128-33.)  His daily job tasks included loading and lifting packages in a warehouse, cleaning floors, and busing tables.  (*Id.*)  Plaintiff testified at the ALJ hearing that he lives with his wife, two step-children, and his mother- and father-in-law.  (Tr. 357.)  Plaintiff testified that he is seeking benefits due to back pain, and due to his difficulty reading and speaking.  (Tr. 358-59.)

In 1988, when Plaintiff was twenty-five years old, he underwent psychological testing by Psychologist Dr. Michael Richardson.  (Tr. 232-33.)  Richardson diagnosed Plaintiff with mixed specific developmental disorder, noting that Plaintiff obtained a verbal IQ score of 76, performance IQ score of 89, and full scale IQ of 79.  (Tr. 233.)  Dr. Richardson found a "strong indication of differential left hemisphere brain dysfunction," a condition "resulting in severe deficits in reading, written expression, memory processing, language development, social comprehension, and verbal concept formation."  (Tr. 234-35.)  Nonetheless, Dr. Richardson suggested that Plaintiff "should be capable of meeting competitive job standards in areas such as food service, production or janitorial."  (Tr. 234.)

On May 2, 2002, Dr. Daniel Larkin, Plaintiff's treating physician since February 2001, examined Plaintiff.  Based on a functional capacity evaluation conducted by Occupational Therapy Specialist Mary Ann Caesar, Dr. Larkin found that Plaintiff was

limited to lifting 45 pounds from the floor to his waist, 20 pounds from his waist to his head, and 40 pounds horizontally. (Tr. 289.) On July 12, 2005, Dr. Ward Jankus evaluated Plaintiff's lower back pain and right shoulder pain. (Tr. 247-29.) Dr. Jankus found that Plaintiff had "activity dependent mechanical lower back pain/lumbar strain--no severe limits in range of motion or obvious neurological deficit on current exam" and a "history of right shoulder injury with difficulty tolerating terminal overhead activities." (Tr. 249.) Plaintiff was diagnosed with partial sacralization of L5 with some degenerative changes at L5-S1, particularly on the right. (Tr. 250.)

Then, in August 2005, the Social Security Administration referred Plaintiff to Dr. Craig Barron for a psychological consultative examination. (Tr. 251.) Dr. Barron administered the third editions of the Wechsler Adult Intelligence Scale ("WAIS-III") and Wechsler Memory Scale ("WMS-III") tests. (*Id.*) Dr. Barron concluded that overall, Plaintiff "demonstrated borderline to mildly retarded intellectual abilities on the WAIS-III." (Tr. 252.) He also noted that Plaintiff's general memory index score of 62 on the WMS-III fell in the "mildly impaired range." (*Id.*) Dr. Barron observed that Plaintiff was "somewhat disheveled and extremely malodorous." (Tr. 253.) Plaintiff self-reported to Dr. Barron that he could bathe and change clothes twice a week, cook simple things that did not require reading instructions, assist with housework, mow the lawn, shovel snow, and take the bus and go shopping with his wife. (*Id.*) Dr. Barron diagnosed Plaintiff with borderline to mild retardation. (*Id.*) He concluded that Plaintiff was cognitively capable of "communicating, comprehending, or retaining simple

directions at an unskilled, competitive employment level," but was not socially and emotionally "capable of withstanding work stresses, attending work regularly, rapidly performing routine repetitive activities on a sustained basis, meeting production requirements, and relating to others at an unskilled competitive employment level." (Tr. 256.)

On May 25, 2005, Plaintiff self-completed a "Function Report" and indicated that the only thing he does during the day is take his wife to appointments. (Tr. 163-70.) He self-reported that he had no problems with personal care, that he could prepare simple meals, do laundry, use public transportation, go shopping, and that he had a hobby of coaching Special Olympics. (Tr. 164-67.) Plaintiff also self-reported that he gets along well with everybody. (Tr. 168.)

In October 2005, Plaintiff was examined by Dr. Thomas Kuhlman, who indicated on a Psychiatric Review Technique Form ("PRTF") that Plaintiff had a medically determinable impairment of borderline intellectual functioning under Listing 12.02 for organic mental disorders. (Tr. 262.) Dr. Kuhlman concluded that Plaintiff had moderate restrictions in activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 271.) Noting that Plaintiff had performed a physical job in the past and that the daily activities data did not indicate the bad hygiene observed by Dr. Jankus, Dr. Kuhlman disagreed with Dr. Jankus's opinion that Plaintiff could not sustain stress tolerance or concentration, persistence, and pace to the required level of

productivity employment.  (*Id.*)  Dr. Kuhlman based his findings not on tests or

examinations that he administered to Plaintiff, but on a self-reported daily activities data

sheet.

In September 2006, Dr. Larkin conducted a physical examination of Plaintiff to

determine if he could participate in Special Olympics.  (Tr. 330.)  Although Dr. Larkin

approved Plaintiff's participation, he also ordered an MRI on Plaintiff's right shoulder,

because the general body MRI showed some joint crepitus and decreased range of motion

in the rotator cuff.  (Tr. 330.)  In November 2006, Dr. Larkin noted that the MRI of

Plaintiff's shoulder indicated "some mild brusal swelling, and some tendinopathy."  (Tr.

332, 334.)  An MRI of Plaintiff's lumbar spine indicated "some degenerative changes,

and some possible encroachment of the L5-S1 on the right," without symptomatology.

(Tr. 332, 335-36.)  From these medical testing results, Dr. Larkin concluded that Plaintiff

was limited to "fairly sedentary work [and be permitted] frequent position changes."  (Tr.

332.)

In December 2006, Plaintiff's home was condemned due to filthy and unsafe

conditions.  (Tr. 323.)  Plaintiff's family received significant assistance from government

agencies in order to move back into the home.  (*Id.*)  Kathleen Eveslage, an attorney for

Southern Minnesota Regional Legal Services,[2] later wrote an affidavit describing her

---

[2]     Southern Minnesota Regional Legal Services ("SMRLS") is a nonprofit civil legal
services provider that provides free legal services to low income individuals on a variety
of issues, including housing, public benefits, and family law.  Based upon the record

(Footnote Continued on Next Page)

experiences assisting Plaintiff's family.[3] (Tr. 228-29.) She noted that Plaintiff, his wife, and their children visited Plaintiff's mother-in-law in a health care facility every day from December 2005 through April 2006. (Tr. 228.) The staff at the facility complained of an offensive smell when Plaintiff and his family visited and suspected the family could not cook because they brought in three meals of fast food every day. (*Id.*)

On February 28, 2007, Dr. Christopher Boys evaluated Plaintiff for Fetal Alcohol Spectrum Disorder at the University of Minnesota Medical Center. (Tr. 304-13.) A physical assessment of Plaintiff conducted by an assistant examiner revealed that his facial features were characteristic of fetal alcohol syndrome. (Tr. 305.) The examiner noted that Plaintiff's speech was hard to understand and that he struggled to put his thoughts into words. (Tr. 306.) The evaluation included several tests, among which were the intelligence and memory tests he had previously taken. (Tr. 304.) On the WAIS-III test, Plaintiff obtained a verbal IQ score of 67, performance IQ score of 84, and full scale IQ score of 73. (Tr. 306-07.) Plaintiff scored in the low average verbal memory and below average visual memory ranges on the WMS-III. (Tr. 310.) Dr. Boys noted that

---

(Footnote Continued From Previous Page)
before the Court, Kathleen Eveslage worked with Plaintiff and his family prior to Benjamin L. Weiss's involvement in this case.

[3] The Court commends the practice of Ms. Eveslage in preparing the affidavit to ensure that the procedural history is set forth accurately before the Court. In this instance, Ms. Eveslage was able to do so without violating the attorney-client privilege, without turning herself into a witness, or without otherwise violating the dignity of her client. The affidavit provided the context and insight to the ALJ and all of those involved in the case prior to the case coming before this Court.

Plaintiff "performed within the below average range on measures of both verbal and non-verbal ability." (*Id.*) Plaintiff also exhibited clinically significant withdrawn behaviors and clinically significant attention problems on the Adult Behavior Checklist. (Tr. 306-07.) At this examination, Plaintiff was also tested for adaptive functioning using the Scale of Independent Behavior ("SIB-R"). (Tr. 311.) Standard scores of 85 to 115 represent the average range. (*Id.*) Plaintiff, however, scored 66 on the broad independence score, suggesting that he "is currently functioning below the age appropriate level." (*Id.*) Plaintiff's score of 56 in the communication and social interaction domain indicated that his skills in such areas were "limited to very limited." (*Id.*) Dr. Boys concluded that the Plaintiff was functioning in the below average range with notable weaknesses in social language and adaptive behavior skills. (Tr. 312.) He diagnosed Plaintiff with borderline intellectual functioning and Fetal Alcohol Spectrum Disorder. (Tr. 312-13.) Dr. Boys then recommended that "[g]iven his level of impairment and its impact on his ability to function independently, we recommend that [Plaintiff] seek SSI assistance to provide a means to support himself." (Tr. 313.)

Finally, in March 2007, Dr. Larkin completed a Medical Opinion Form on Plaintiff's behalf. (Tr. 3, 303.) He indicated that Plaintiff had chronic lower-back pain and right shoulder pain. (Tr. 303.) Dr. Larkin concluded that Plaintiff should sit for only four hours each day and that he should stand only for four hours each day with a sitting break every hour. (*Id.*) Dr. Larkin noted that while standing, Plaintiff "needs to move."

(*Id.*)  According to Dr. Larkin, Plaintiff should also be limited to four hours of walking each day and should not lift or carry more than 10 pounds.  (*Id.*)

The ALJ held a hearing regarding Plaintiff's case on July 3, 2007.  The ALJ employed the required five-step evaluation and concluded that Plaintiff was not disabled.  *See* 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)(4).  (Tr. 15-16.)  At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 5, 2004.  (Tr. 17.)  At the second step of the evaluation, the ALJ found that Plaintiff had severe impairments of:  "Degenerative disc disease of the lumbar spine, history of leg discrepancy, mild tendiopathy in the supraspinatus tendon on the right shoulder, and borderline intellectual functioning."  (*Id.*)

An individual who passes the first two steps may qualify for disability at step three if he meets the criteria of the Listing of Impairments.  20 C.F.R. § 404.1520(a)(4)(ii), (d).  Individuals who meet the Listings are presumed to have sufficient barriers to employment and are considered incapable of performing full-time work without special reports.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.00A.  An individual may also qualify at step three if he "equals" the Listings, meaning that he has a medical condition that does not explicitly meet the Listing criteria but is equivalent in severity, duration, and functional impact to a listed impairment.  20 C.F.R. §§ 404.1525(c)(5), 404.1526.  If a person qualifies at step three, the analysis stops.  20 C.F.R. § 416.920(a)(4)(iii).

At the third step of the evaluation, the ALJ concluded that Plaintiff did not have an impairment or impairments that met or medically equaled one of the listed impairments

of 20 C.F.R. Pt. 404, Subpt. P, App. 1, and disqualified Plaintiff from receiving DIB and

SSI in step five of the analysis. (Tr. 18.) Here, the Court is faced with deciding whether

Plaintiff meets the criteria of Listing 12.05C.

## DISCUSSION

### I.     Standard of Review

This Court reviews a decision denying social security benefits *de novo*. *Pelkey v.*

*Barnhart,* 433 F.3d 575, 577 (8th Cir. 2006). If the decision of the Commissioner is

supported by substantial evidence on the record as a whole, this Court must affirm.

*Harris v. Barnhart,* 356 F.3d 926, 928 (8th Cir. 2004). Substantial evidence is less than a

preponderance, but enough that a reasonable mind would find it adequate to support the

ALJ's determination. *Guilliams v. Barnhart,* 393 F.3d 798, 801 (8th Cir. 2005). The

Court must consider the evidence which detracts from the Commissioner's decision, as

well as the evidence that supports the decision. *Karlix v. Barnhart*, 457 F.3d 742, 746

(8th Cir. 2006). This Court will not reverse simply because some evidence supports a

conclusion other than that which the Commissioner reached. *Pelkey,* 433 F.3d at 578.

The Court must also defer to an ALJ's well-reasoned determinations of credibility if they

are supported in the record by substantial evidence. *Id.* Here, based on the record before

it, the Court respectfully disagrees with the decisions reached by the ALJ and Magistrate

Judge because substantial evidence on the record as a whole does not support denying

Plaintiff benefits.

## II. **Analysis**.

Plaintiff alleges that he qualifies for DIB and SSI because he meets the Listing requirement of Listing 12.05C, 20 C.F.R., Pt. 404, Subpt. P, App. 1, *supra*.

Listing 12.05C states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

> \* \* \*

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Listing 12.05C, 20 C.F.R., Pt. 404, Subpt. P, App. 1. Therefore, Listing 12.05C requires four elements: (1) deficits in adaptive functioning; (2) evidence of initial manifestation before age 22;[4] (3) a valid verbal, performance or full-scale IQ score between 60 and 70;

---

[4] Plaintiff asserts that the Magistrate Judge and the ALJ have committed legal error in conflating two separate elements: (1) deficits in adaptive functioning and (2) manifestation of the impairment before age 22. Plaintiff claims that "the applicant need only provide evidence tending to support the proposition that the impairment, rather than any specific deficits in adaptive functioning, manifested before age 22." However, the Court rejects Plaintiff's interpretation based on prior courts' interpretation of Listing 12.05C and concurs with Magistrate Judge Keyes's explanation in his R&R. As the Magistrate Judge explained, "The diagnostic description for mental retardation . . . requires that a claimant demonstrate both subaverage general intellectual functioning *and* deficits in adaptive functioning" initially manifested in the developmental period. *Durden v. Astrue*, 586 F. Supp. 2d 828, 832 (S.D. Tex. 2008) (emphasis added); *see also id.* at 833 (requiring claimant "to demonstrate that she had deficits in adaptive

(Footnote Continued on Next Page)

and (4) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05C. Since Plaintiff meets all four criteria of Listing 12.05C, Plaintiff does indeed qualify for DIB and SSI.

### 1. Deficits in adaptive functioning.

The Social Security Administration noted that the definition of mental retardation used in the Listings "is consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations [that deal with mental retardation]." Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018-01, 20022 (Apr. 24, 2008). Further, in *Durden*, as this Court finds persuasive, the United States District Court for the Southern District of Texas explained that:

---

(Footnote Continued From Previous Page)
functioning *initially manifested in the developmental period*") (emphasis added). The weight of authority relating to the required showing a claimant must make to be determined disabled under Listing 12.05 supports the proposition that a claimant must prove onset of deficits in adaptive functioning prior to age 22. *See Carmack v. Barnhart*, 147 Fed. Appx. 557, 560 (6th Cir. 2005) ("Nor does the evidence demonstrate or support *onset of 'deficits in adaptive functioning' before age 22.*") (emphasis added); *Gist v. Barnhart*, 67 Fed. Appx. 78, 81 (3d Cir. 2003) ("In order to meet or equal Listing 12.05, a claimant *must prove that she experiences 'deficits in adaptive function' with an onset prior to age 22.*") (emphasis added); *Vaughn v. Astrue*, 494 F. Supp. 2d 1269, 1273 (N.D. Al. 2007) ("[Listing 12.05] imposes three requirements: (1) Significant subaverage general intellectual functioning; (2) deficits in adaptive functioning and (3) the *deficits must be manifested before age 22.*") (emphasis added). *Maresh* does not require a different interpretation; rather, *Maresh* suggests that proof of early onset of such deficits is a requirement under Listing 12.05. *See* 438 F.3d at 900 (noting that the claimant "exhibited deficits in adaptive functioning at a young age"). Therefore, Listing 12.05C requires proof of an onset *of deficits in adaptive functioning* prior to the age of 22.

Although the SSA has not explicitly defined "deficits in adaptive functioning," Listing 12.00 does provide criteria for assessing the "severity" required by section (C) of some other mental impairments and by section (D) of Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C). These criteria include "adaptive activities of daily living," (such as "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office"), "social functioning" (including "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers") and "concentration, persistence, or pace" (defined as "the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings"). *Id.* at § 12.00(C)(1)-(3). Although it is not clear that the SSA intended these criteria to be synonymous with the term "deficits in adaptive functioning," some courts have considered these criteria when determining whether a claimant has the deficits in adaptive functioning required to meet Listing 12.05(C) because they overlap, to some extent, with the examples of adaptive functioning behaviors provided in the [*Diagnostic and Statistical Manual of Mental Disorders-IV*].

*Durden*, 586 F. Supp. 2d 828, 832 (S.D. Tex. 2008).

Plaintiff suffers from deficits in adaptive activities of daily living, deficits in social functioning, as well as deficits in concentration, persistence, or pace. As the *Durden* Court explained, deficits in daily living include deficits in "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." *Durden*, 586 F. Supp. 2d at 832. On June 15, 2006, Plaintiff's home was condemned and a Notice of Condemnation as Unit for Human Habitation and Order to Vacate was filed. (Tr. 218.) His home was condemned because of "gross unsanitary conditions," because the "interior ceilings [were] defective . . . the interior walls [were] defective . . . [and because of a] lack of properly installed and operatable smoke

detector." (Tr. 218-20.) Plaintiff and the other adults living in his home were ordered to "replace/remove all torn/soiled carpet" and complete a number of other renovations in order to move back into the house. (Tr. 218-20.) A report by the City of St. Paul was also filed regarding the condemnation of Plaintiff's house. (Tr. 221-23.) The City ordered Plaintiff to "clean garbage and refuge from inside and outside of house, sanitize and seal" the home, and also listed numerous building, electrical, plumbing, and heating problems with the house that needed to be addressed. (Tr. 221-23.)

As noted earlier, Ms. Eveslage assisted Plaintiff during his condemnation and filed an affidavit documenting her experience with Plaintiff. (Tr. 228.) She explained that "the home was identified as a garbage house. The inspection notes stated that the entire back yard and all the closets in the home were filled with garbage, rotting food and feces. Child protection had determined that Richard and Mary's children were unsafe in those conditions and could not live in the home." (*Id.*) Eveslage also discussed Plaintiff's inability to manage his finances, "because despite having adequate income," Plaintiff failed to pay his bills properly, his home was facing foreclosure, and he was behind in utility payments. (*Id.*) Further, Mary Possehl, Plaintiff's mother-in-law, was facing involuntary discharge from Harmony Care Center because the family had failed to pay for Mary's care. (*Id.*) Eveslage wrote in her affidavit that the Harmony Care Center had told her that Plaintiff and his family were bringing fast food for all three meals every day they visited Mary, from December 2005 (before the house was condemned) to April 2006. (*Id.*) The facility reported that the family's smell was so malodorous that

"employees at the facility complained that they could smell the Contreras' coming down the hallway. The smell was so offensive that the facility would shampoo the upholstered chairs the family slept in after each daily visit." (*Id.*)

On May 16, 2007, a Social Security Disability Report was completed regarding Plaintiff's Social Security request. (Tr. 152-54.) Plaintiff reported to the interviewer, L. Mcdermond, that he could not read any of the applications or forms and stated that none of his family members could read either. (Tr. 154.) Mcdermond also noted that Plaintiff's speech was hard to understand and that Plaintiff had much difficulty answering questions, forcing Mcdermond to rephrase questions many times. (Tr. 154.)

On August 1, 2005, Dr. Craig Barron, a clinical psychologist, conducted a mental status examination, an assessment of daily activities, and a review of Plaintiff's medical records. (Tr. 252.) Dr. Barron found that Plaintiff does not pay rent or bills, nor has he ever done so. (Tr. 256.) Dr. Barron also found that Plaintiff cannot shop by himself and does not function independently. (*Id.*) Plaintiff was diagnosed with "borderline mental retardation." (Tr. 255.) Dr. Barron recommended, based on Plaintiff's medical record, as well as his own tests and examinations, that "on the basis of the client's cognitive capabilities, it would appear that he is capable of communicating, comprehending, or retaining simple directions at an unskilled, competitive employment level," but, "on the basis of the client's current social and emotional functioning, it would not appear that he is capable of withstanding work stresses, attending work regularly, rapidly performing

routine repetitive activities on a sustained basis, meeting production requirements, and relating to others at an unskilled, competitive employment level." (Tr. 256.)

Further, on February 29, 2007, Dr. Christopher Boys conducted a Fetal Alcohol Spectrum Disorder Evaluation Report. (Tr. 311.) Dr. Boys administered the SIB-R to Plaintiff in order to formally assess adaptive functioning in the areas of communication, daily living, socialization and motor skills. (*Id.*) Standard scores of 85 to 115 represent the average range. (*Id.*) Dr. Boys concluded that Plaintiff's Broad Independence score of 66 "suggest[s] that [Plaintiff] is currently functioning below age appropriate level." (*Id.*) Plaintiff also obtained a score of 56 in the area of Communication and Social Interaction and scores in the mid-70s for Personal Living and Community Living, with particular limitations in personal self-care, domestic skills, time and punctuality, work habits, pre-vocational skills, and getting around the community. (*Id.*)

Plaintiff also displays deficits in social functioning. In August 2005, Dr. Barron noted that Plaintiff is "limited in terms of friendship." (Tr. 255.) In February 2007, Dr. Boys noted that Plaintiff's thought processes and associations did not always appear clear and understandable. (Tr. 306.) Dr. Boys also noted that Plaintiff often used minimal words to explain his thought; his words frequently appeared not to make sense with the testing task or they were out of order. (*Id.*) Plaintiff struggled to put his thoughts into words and would state this to the examiner. (*Id.*) Dr. Boys also found the Plaintiff's skills in the Social Interaction and Communication Domain were in the limited to very limited range. (Tr. 311.)

Not only does Plaintiff exhibit deficits in daily living and social functioning, but he also exhibits deficits in concentration, persistence, or pace. Dr. Boys concluded after his medical examination that Plaintiff demonstrates limited to very limited language expression and language comprehension skills (e.g., understanding, signals, signs, speech, and in deriving information from spoken and written language). (Tr. 311.) Dr. Boys also found that Plaintiff demonstrates limited skills in the areas of time and punctuality (e.g., time concepts), and work (e.g., work habits and prevocational skills) and home/community skills (e.g., getting around the home, neighborhood, and traveling in the community). (*Id.*) Plaintiff was diagnosed by Dr. Boys as having Alcohol Related Neurodevelopmental Disorder and, given that he scored below average in cognitive ability and adaptive behavior skills, Plaintiff met criteria for Borderline Intellectual Functioning. (Tr. 312.) Dr. Boys then recommended that, due to "his level of impairment and its impact on his ability to function independently, we recommend that Richard seek SSI assistance to provide a means to support himself." (Tr. 313.)

Defendant claims that Plaintiff does not have deficits in adaptive functioning; however, most of Defendant's arguments are based on self-reports by Plaintiff and not on medical examinations or objective findings.[5] Although Defendant relies upon Plaintiff's May 13, 2005 Function Report, this report was completely self-reported and not based on

---

[5]     The Court respects Plaintiff's dignity and does not wish to discredit or devalue Plaintiff by placing greater controlling weight with medical examinations and tests rather than Plaintiff's self-reports.

medical tests or examination findings. (Tr. 163-70.) Defendant asserts that because Plaintiff graduated from high school, performed household activities, and demonstrated an ability to find work, he does not suffer from deficits in adaptive functioning. Defendant relies upon Plaintiff's statements during the ALJ hearing in which Plaintiff testified that he takes care of his personal needs, helps his wife around the house, and cuts the grass at his home. (Tr. 360.) The ALJ also relies on Plaintiff's self-report that he can take care of his step-children without assistance. (Tr. 19.) However, Plaintiff's house was condemned and his step-children were put into foster care because the City was concerned for their safety. Defendant also relies upon a medical examination conducted in July 2003 when the attending doctor found Plaintiff to be "quite functional."[6] (Tr. 328.) However, this medical examination was only to determine whether Plaintiff could participate in the Special Olympics that year and, although Defendant claims that the physician was Plaintiff's treating physician, that is not the case. Plaintiff's treating physician is Dr. Larkin, and Dr. Timothy Lane was the doctor who administered the examination in July 2003. (*Id.*) It is unreasonable to rely heavily upon the cursory observation of a one-time visit with a physician who was unfamiliar with Plaintiff's

---

[6] An evaluation was performed by Dr. Timothy Lane, who was referred to in the R&R as Plaintiff's "own physician." (R&R at 21.) The record shows, however, that Dr. Lane's involvement with Plaintiff was limited and that Dr. Daniel Larkin was Plaintiff's primary treating physician.

medical history and records.[7]  Defendant also claims that because Plaintiff worked two

12-day stints at the State Fair in the summer of 2007 that he does not suffer deficits in

adaptive functioning.  (Tr. 216, 371.)  Plaintiff's sole responsibility during these four

weeks of employment was directing traffic.  (*Id.*)  Simply because Plaintiff had the

mental capacity to direct traffic for two 12-day stints does not imply that Plaintiff does

not suffer from deficits in adaptive functioning.  The evidence in the record clearly

weighs against this limited, independent, instance of employment.

Defendant heavily relies upon the medical opinion of Dr. Thomas Kuhlman.

Dr. Kuhlman conducted a Mental Residual Functional Capacity Assessment on

October 12, 2005.  (Tr. 257-59.)  The record fails to reflect that Dr. Kuhlman conducted

any of his own mental or physical tests; he relies solely upon Plaintiff's self-reporting and

the "medical evidence" in Plaintiff's file.  (*Id.*)  Dr. Kuhlman concludes that Plaintiff's

ability to tolerate and respond appropriately to stress in the workplace would be reduced

but adequate to handle the stress of a routine, repetitive work setting, and focus on simple

work-related, verbal instructions.  (*Id.*)  Dr. Kuhlman writes that "self-care/hygiene

sounds to have been terrible the day of the psychological examination but daily activities

data does not show this."  (Tr. 273.)  However, the daily activities data is self-reported

and Dr. Kuhlman further notes that the daily activities data from Plaintiff and his spouse

---

[7]     The level of involvement between Dr. Lane and Plaintiff does not suggest that
Dr. Lane's narrow assessment, which lacks any substantial context, should be accorded
significant weight.  This is especially true in light of the extensive evidence in the record
showing that Plaintiff suffered from adaptive functioning deficits.

is "cryptic and not well rendered in language." (Tr. 273.) Further, Dr. Kuhlman notes that the psychological examination panelist suggests that it is doubtful Plaintiff can sustain stress tolerance and concentration/persistence/pace to SGA levels of productivity at any job. (*Id.*) Despite this finding, Dr. Kuhlman writes that he finds inadequate support for this finding in other medical evidence, but he fails to specify what medical evidence in the record proves that Plaintiff can indeed sustain stress tolerance and concentration, persistence, and pace necessary for employment. (*Id.*)

Finally, the ALJ also determined that the absence of reference to hygiene problems in Dr. Boys' report and two 2006 physical examinations demonstrates the existence of Plaintiff's adequate adaptive functioning. (Tr. 19-20.) However, the Eighth Circuit has explicitly rejected this method of analysis. In *Shontos v. Barnhart*, an ALJ rejected a treating source opinion on concentration, persistence, and pace on the ground that the treatment records did not specifically state that the claimant had been late for her appointments. *Shontos v. Barnhart*, 328 F.3d 418, 425 (8th Cir. 2003). The Eighth Circuit reversed the ALJ's decision, stating that the record was at most "deficient in documentation" and the ALJ has no authority to "draw upon his own inferences from medical reports." *Id.* at 47 (citing *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975)). Therefore, the fact that Dr. Larkin did not take note of hygiene issues in his examination in March and April 2006 does not constitute substantive evidence.

At the conclusion of the hearing, the ALJ found Plaintiff to be mildly impaired in Activities of Daily Living and moderately impaired in Social Functioning and

Concentration, Persistence, and Pace. (*Id.*) These areas are practically synonymous with the components of adaptive functioning that are associated with Listing 12.05C. Listing 12.05C does not require "marked" limitation in adaptive functioning, which would make it redundant with Listing 12.05D. *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (where possible, regulation must be interpreted so that no clause, sentence, or word is superfluous, void, or insignificant). Therefore, even accepting that the ALJ's findings of mild to moderate deficits in adaptive functioning is enough to satisfy the first element of Listing 12.05C, the overwhelming evidence in the record goes to show that Plaintiff does in fact suffer from deficits in several kinds of adaptive functioning. Therefore, Plaintiff meets the first criterion for Listing 12.05C.

### 2. The evidence demonstrates or supports onset of the impairment before age 22.

Plaintiff satisfies the second element of Listing 12.05C because he demonstrates an onset of the adaptive functioning impairment before age 22. First, Plaintiff was "almost immediately found eligible for special education services" and received special education services from kindergarten through high school. (Tr. 254, 305.) Further, Plaintiff had to repeat tenth grade because he failed to pass the grade initially. (*Id.*) Dr. Barron found that as a child, Plaintiff was slow to talk with numerous articulation and expressive language problems and was "obviously limited cognitively." (Tr. 253.) In 2007, Dr. Boys conducted a Fetal Alcohol Spectrum Disorder evaluation for Plaintiff and diagnosed Plaintiff with Borderline Intellectual Functioning and Fetal Alcohol Spectrum Disorder. (Tr. 312-13.) Dr. Boys noted that "previous records indicate that Child

Protection Services became involved when [Plaintiff] was very young due to neglect and prenatal alcohol exposure." (Tr. 304-05.) Further Dr. Boys noted that "Richard's overall facial appearance is characteristic of Fetal Alcohol Syndrome." (Tr. 305.) Dr. Boys based his diagnosis on Plaintiff's birth, family and social history, a physical assessment, and cognitive functioning examinations and testing. (Tr. 304-13.) Based on Plaintiff's enrollment in special education from kindergarten through high school, his failure of the tenth grade, and the fact that he suffers from Fetal Alcohol Syndrome because of prenatal alcohol exposure, there is substantial evidence in the record that Plaintiff does in fact demonstrate the onset of the impairment before the age of 22.[8]

In *Ronda Vaughn v. Astrue,* the court found that Vaughn's deficits in adaptive functioning began in her formative years based on the fact that she was in special education for mental retardation and that a clinical psychologist concluded after testing that the plaintiff read at a fourth grade level and performed arithmetic at a second grade

---

[8]     The Court respectfully observes that neither the ALJ's decision nor the Magistrate Judge's R&R provide sufficient attention or weight to the gravity and severity of Fetal Alcohol Syndrome and its impact on an individual with Plaintiff's mental capacity and diagnosis. The record contains evidence that Plaintiff clearly suffered from Fetal Alcohol Syndrome, a condition that he, necessarily, would have suffered at the time of his birth and throughout his life. The record also shows that Plaintiff's mother drank heavily while pregnant with him and he was the subject of child protection proceedings due to neglect and prenatal alcohol exposure. (Tr. at 304-05.) When Plaintiff underwent an evaluation noting his Fetal Alcohol Syndrome, the evaluator also noted that Plaintiff continued to suffer from deficits and that his "thought processes and associations did not always appear clear and understandable"; his words "often appeared to not make sense" or "were out of order"; and his "fund of knowledge did not appear to be adequate for his age." (Tr. at 306.) This evidence is also relevant to evaluating Plaintiff's concentration, persistence, or pace and suggests additional deficits in adaptive functioning.

level.  *Ronda Vaughn v. Astrue*, 494 F. Supp. 2d 1269, 1274 (N.D. Ala. 2007).  In

*Douglas A. Maresh v. Barnhart,* the court found that Maresh also exhibited deficits in

adaptive functioning at a young age based on the fact that he struggled in special

education classes through ninth grade, and then dropped out of school, he had trouble

with reading, writing and math, and he had frequent fights with other children.

*Douglas A. Maresh v. Barnhart,* 438 F.3d 897**,** 900 (8th Cir. 2006).  Here, Plaintiff has

also been in special education classes for his entire elementary and secondary education

and struggled based on the fact that he had to repeat the tenth grade.  Plaintiff obtained a

reading grade equivalent of 4.5 and math grade equivalent of 8.0 on an examination that

was administered on January 6, 1988, by Dr. Mike Richardson.  (Tr. 253.)  In 2007, when

Dr. Boys administered the WAIS-III exam to Plaintiff, Plaintiff continued to perform in

the below average range on measures of both verbal ability and nonverbal ability.  (Tr.

307.)  Therefore, Plaintiff clearly demonstrates the impairment of mental retardation or

deficits in adaptive functioning before the age of 22.

### 3.    A valid verbal, performance, or full scale IQ of 60 through 70.

A general rule dictates how the Court should identify a valid verbal, performance,

or full scale IQ score of 60 through 70:  "In cases where more than one IQ is customarily

derived from the test administered, e.g., where verbal, performance, and full-scale IQs are

derived from the Wechsler series, we use the lowest of these in conjunction with [Listing]

12.05."  Listing of Impairments, Listing 12.00D6c.  Further, the Eighth Circuit has

suggested that when there is more than one valid IQ score, the lowest score should be used. *Muncy v. Apfel*, 247 F.3d 728, 733-34 (8th Cir. 2001).

According to his medical records, Plaintiff achieved a valid verbal, performance, or full scale IQ of 60 through 70 twice. The first instance was when Plaintiff received a full scale IQ score of 69 on the WAIS-III intelligence test on August 1, 2005, when the Social Security Administration referred Plaintiff to Dr. Craig Barron for a psychological consultative examination. (Tr. 251.) The second occurrence was when Plaintiff received a verbal IQ score of 67 on the WAIS-III intelligence test that was administered by Dr. Boys on February 28, 2007. (Tr. 307.) Although Plaintiff had minimally higher IQ scores in a 1988 examination, the Court must use the lowest of the valid IQ scores when deciding this case. (Tr. 233.)

The case before the Court is not a situation in which Plaintiff is functioning adequately and independently in society despite a low tested IQ. (Tr. 218-29, 317-25); *Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (plaintiff was working full-time at the time of the hearing, had attended regular classes in high school with B grades, passed driver's license examination and lived independently). Therefore, Plaintiff satisfies the third element of Listing 12.05C.

### 4. A physical or other mental impairment imposing an additional and significant work-related limitation of function.

Plaintiff suffers from a severe physical back and shoulder impairment that imposes an additional and significant work-related limitation of function; and thus, Plaintiff satisfies the fourth element of Listing 12.05C. Plaintiff's back pain and condition has

progressively worsened throughout the past seven years.  On May 2, 2002, Dr. Larkin, Plaintiff's treating physician since February 2001, concluded that Plaintiff was limited to lifting 45 pounds floor to waist, lifting 20 pounds waist to overhead, and lifting 40 pounds horizontally, pursuant to the functional capacity evaluation conducted by Mary Ann Caesar.  (Tr. 289.)  On July 12, 2005, Dr. Jankus examined Plaintiff and found that Plaintiff's lower back pain/lumbar strain was activity-dependent but there were no severe limits in range of motion or obvious neurological deficit on the exam and that Plaintiff's medical history of his right shoulder injury indicates Plaintiff's difficulty in tolerating terminal overhead activities.  (Tr. 247-49.)  Dr. Jankus diagnosed Plaintiff with partial sacralization of L5 with some degenerative changes at L5-S1, particularly on the right.  (Tr. 240.)  Then on March 28, 2007, Dr. Larkin examined Plaintiff again and wrote in his Medical Opinion Form that Plaintiff suffers from lower back pain and shoulder pain that is expected to last his entire lifetime.  (Tr. 303.)  Dr. Larkin also wrote that Plaintiff is limited to four hours sitting, four hours standing (with breaks every hour for Plaintiff to move around), four hours walking and is *limited to lifting and carrying only 10 pounds* (emphasis added).  (Tr. 303, 316.)

As documented by an October 2006 MRI, Plaintiff has a degenerative disc disease in his lumbar spine with distortion of the nerve roots at L4 and L5.  (Tr. 335-36.)  His treating physician, Dr. Larkin, has restricted him to lifting no more than 10 pounds and standing and sitting for no more than four hours per day in combination.  Absent special circumstances, the opinion of a treating physician is entitled to significant, if not

27

controlling, weight.  20 C.F.R. § 416.927(d)(2) (opinion of treating physician is entitled to controlling weight if supported by acceptable diagnostic techniques and is not inconsistent with other substantial evidence, and even if not granted controlling weight, is generally entitled to more than non-treating source).  The Medical Expert at the ALJ hearing, Dr. LaBree, disagreed with Dr. Larkin's conclusions, but felt that Plaintiff was physically restricted to light work.  Dr. LaBree testified that this restriction would demonstrate a "severe" impairment for Social Security purposes.  (Tr. 376.)  The Eighth Circuit has ruled that the opinion of the non-treating, non-examining medical expert is not substantial evidence sufficient to deny controlling weight to the opinion of a treating source.  *See*, *e.g.*, *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Henderson v. Sullivan*, 930 F.2d 19, 21 (8th Cir. 1991).  However, even if Dr. LaBree's conclusion was favored over Dr. Larkin's, Dr. LaBree's classification of Plaintiff's injury as "severe" satisfies the final element of Listing 12.05C.  (Tr. 376.)

Therefore, Plaintiff satisfies all four elements of Listing 12.05C and passes the third step of the five-step evaluation.  If a person passes step three, the analysis stops and the individual qualifies for disability insurance.  20 C.F.R. §§ 404.1520(a)(4)(ii), (d), 416.920(a)(4)(iii).

## CONCLUSION

Based upon the substantial evidence before the Court, the Court cannot affirm the Commissioner of Social Security's decision and the Report and Recommendation.

Moreover, the Court concludes that the evidence in the record is sufficient to grant Plaintiff's motion for summary judgment and order his entitlement to disability and Supplemental Security Income benefits due to his mental retardation and other disability. There is substantial evidence, as the Court has noted above, that the Plaintiff meets all four elements of Listing 12.05C.

The Plaintiff, Richard J. Contreras, has been trying to obtain what he is entitled to for well over four years. Given the procedural history of the case and the delays associated with the Social Security disability process itself, including the procedural history before the undersigned, comment by this Court is appropriate.[9]

The United States General Accounting Office ("GAO") has been asked by the United States House of Representatives Subcommittee on Social Security Committee on Ways and Means to examine the issues of backlog and delay associated with the disability claims process.[10] More recently, the American Recovery and Reinvestment Act of 2009 provided the Social Security Administration with an additional $500 million to help address the increasing disability and retirement workloads caused by the

---

[9]     The average time from filing to disposition of a social security case in this District is approximately 400 days, which is consistent with the amount of time that it took the Court to decide this case.

[10]     *See* United States General Accounting Office, <u>Report to the Chairman, Subcommittee on Social Security, Committee on Ways and Means, House of Representatives,</u> "Dissappointing Results from SSA's Efforts to Improve the Disability Claims Process Warrant Immediate Attention," GAO-02-322, February 2002; Letter from Barbara D. Bovbjerg, Associate Director, Income Security Issues, to Rep. E. Clay Shaw, Jr., Chairman, Subcommittee on Social Security Committee on Ways and Means, and to Rep. Mac Collins (March 4, 1999).

combination of the economic downturn and the crest of the baby boomer retirement wave. Hopefully, this will reduce the backlog, expedite the process, and reduce the number of impending hearings. In fact, this issue has drawn the attention of media representatives across the country as recently as August of this past year. *See* Brent Walth and Bryan Denson, <u>Disabled, Then Lost in Federal Quagmire//Many Die before Seeing a Cent of Social Security Benefits</u>, St. Paul Pioneer Press, August 10, 2008; Erik Eckholm, <u>Disability Cases Last Longer as Backlog Rises</u>**,** N.Y. Times, December 10, 2007.

Few can argue with the famous quote and statement: "Justice delayed is justice denied." Sadly, that is the situation here. In the Court's experience, it is highly likely that Plaintiff and his family have experienced considerable economic and psychological hardship, as so many applicants have, during his four plus year quest to receive disability income. The justice system and, yes, the legal profession and the courts of this country must strive to fulfill the promise of the Constitution to provide equal access to justice and equal justice to all. This necessarily requires the availability of counsel from both the private and public sectors, especially for those individuals who are in legitimate need and are entitled to Social Security and Supplemental Social Security Income Disability benefits. It requires not only placing the proper priority on such cases, but providing ample resources for such cases. Justice demands no less.

**ORDER**

1.      Plaintiff Richard J. Contreras's objections (Doc. No. 21) to the Report and Recommendation dated March 25, 2009, are **GRANTED**.

2.      The Report and Recommendation dated March 25, 2009 (Doc. No. 19), is **REVERSED**.

3.      Plaintiff's Motion for Summary Judgment (Doc. No. 9) is **GRANTED**.

4.      Defendant's Motion for Summary Judgment (Doc. No. 15) is **DENIED**.

5.      The decision of the Commissioner of Social Security is **REVERSED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  August 26, 2009       s/Donovan W. Frank
                                DONOVAN W. FRANK
                                United States District Judge